Andrew BLOOD and Carrie Blood, Plaintiffs–Appellees,

v.

QWEST SERVICES CORPORATION and Qwest Corporation, Defendants–Appellants,

and

Public Service Company of Colorado, d/b/a Xcel Energy, Third–Party Defendant–Appellee.

No. 08CA0134.

Colorado Court of Appeals, Div. IV.

April 30, 2009.

As Modified on Denial of Rehearings May 28, 2009.*

* Richman, J., would grant the petition for defendants-appellants.

Fogel, Keating, Wagner, Polidori & Shafner, P.C., William L. Keating, Kristin D. Sanko, Michael O'Brien Keating, Denver, Colorado, for Plaintiffs–Appellees.

Gibson, Dunn, & Crutcher, L.L.P., Gregory J. Kerwin, Robert C. Marshall, Denver, Colorado; Treece, Alfrey, Musat & Bosworth, P.C., Thomas N. Alfrey, Robert J. Zavaglia, Jr., Denver, Colorado, for Defendants–Appellants.

White and Steele, P.C., John Lebsack, David J. Nowak, Denver, Colorado, for Third–Party Defendant–Appellee.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Friedrick C. Haines, First Assistant Attorney General, Kathleen L. Spalding, Assistant Attorney General, Denver, Colorado, for Amicus Curiae, the State of Colorado.

Opinion by Judge WEBB.

In this personal injury action that raises questions of first impression concerning recovery of exemplary damages, defendants, Qwest Services Corporation and Qwest Corporation (collectively, Qwest), appeal the trial court's judgment entered on a jury verdict in favor of plaintiffs, Andrew Blood (Blood) and Carrie Blood, and third-party defendant Public Service Company of Colorado, doing business as Xcel Energy (Xcel), and its denial of Qwest's post-trial motions.

We vacate the trial court's order increasing exemplary damages and remand for an evidentiary hearing on Blood's motion to increase exemplary damages. In all other respects, the judgment and orders are affirmed.

Table of Contents

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 309
 A. Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 309
 B. Blood's Theory of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 309
 C. Trial Court Rulings and Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 309

II. Exemplary Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 310
 A. Constitutionality of Section 13–21–102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 310
 1. Exemplary Damages and Nonparty Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 310
 2. Facial Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312
 3. As Applied Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 313
 B. Sufficiency of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314
 C. The Amount of the Jury's Exemplary Damages Award . . . . . . . . . . . . . . . . . . . . . . . . 315
 1. Reprehensibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315
 2. Ratio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316
 3. Sanctions for Comparable Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 317
 D. Failure to Grant Qwest a Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

III. Qwest's Post–Accident Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 320
 A. Violation of the In Limine Ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 320
 B. Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 321

IV. The Joint Use Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 322
 A. References to JUC Article XII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 322
 B. Submitting Material Breach to Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324
 C. Jury's Verdict Holding Qwest 100% Culpable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325
 D. Jury Instruction on Xcel's Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326

V. Qwest's Affirmative Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 327
 A. Worker's Compensation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 327
 1. Affirmative Defense or Jurisdictional Defense . . . . . . . . . . . . . . . . . . . . . . . . . 327
 2. Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 328
 B. Premises Liability Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

VI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

## I. Introduction

### A. Facts

Blood suffered severe and permanent injuries while working on a wood utility pole (P5905) within the course and scope of his employment as a lineman for Xcel. Qwest owned P5905, along with thousands of similar poles in Colorado. Since 1960, it has shared with Xcel use of its poles and has used poles owned by Xcel under a Joint Use Contract (JUC). The JUC made each party responsible for injuries to its employees arising from a jointly used pole, although indemnity was required if the injuries were caused "solely" by the other party's negligence or noncompliance with JUC specifications.

In anticipation of relocating P5905 at the request of the nonparty property owner, Xcel electric lines, Qwest telephone lines, and the sole supporting guy line had been removed shortly before the accident. On June 24, 2004, with the pole now unsupported, Blood climbed it to remove the last piece of Xcel equipment. The pole broke below ground where it had decayed, causing Blood to fall, and the pole came down on top of him.

### B. Blood's Theory of the Case

Blood sued Qwest for negligence. His wife, Carrie, sued for loss of consortium. Blood asserted that Qwest's negligence in failing to have inspected P5905 since its installation in 1958, which would have detected the decay, was the sole cause of the accident. He sought exemplary damages on the basis that Qwest had no program periodically to inspect any of its poles, either before or after the accident.

Qwest asserted affirmative defenses including, as relevant here, Blood's comparative negligence; exclusivity under the Colorado Workers' Compensation Act, section 8–41–102, C.R.S.2008 (WCA), as Blood's statutory employer; and the Premises Liability Act, section 13–21–115(5)(b), C.R.S.2008 (PLA).

Qwest also pleaded third-party claims against Xcel for negligence, indemnity under the JUC, contribution, and breach of the JUC. Xcel counterclaimed against Qwest for negligence and breach of the JUC.

### C. Trial Court Rulings and Jury Verdict

The trial court granted partial summary judgment for Xcel on Qwest's contribution claim, reasoning that the WCA abolished any tort duties of Xcel to Blood, and for Xcel on Qwest's negligence claim, applying economic loss rule. The court also granted Qwest's in limine motions to exclude evidence or argument regarding the indemnity provision in the JUC, Qwest's not having implemented a post-accident periodic pole inspection program, and potential harm to nonparties from lack of such a program. None of these rulings has been appealed.

The jury was instructed that it could award exemplary damages only if Qwest acted in a "willful and wanton manner," meaning conduct "purposefully committed by a person who must have realized that the conduct was dangerous, and which conduct was done heedlessly and recklessly, either without regard to the consequences, or without regard to the rights and safety of others, particularly the plaintiff."

The jury found that Qwest was negligent, that Blood and Xcel were not negligent, and that Qwest was 100% at fault. It awarded $9,917,600 in economic losses, $1,000,000 in noneconomic losses, $10,000,000 for physical impairment and disfigurement, $750,000 for loss of consortium, and $18,000,000 in exemplary damages. The amount of compensatory damages is not contested on appeal. The jury also found that Qwest had breached the JUC. It returned a verdict in favor of Xcel on the JUC counterclaim.

Blood moved to increase exemplary damages under section 13–21–102(3)(a), C.R.S. 2008, because Qwest had not implemented a periodic pole inspection program between the date of the filing of this action and the trial. Without holding a hearing as requested by Qwest, the court granted the motion and increased the exemplary damages to three times the compensatory damages. The court denied Qwest's numerous post-judgment motions. After reducing the noneconomic damage awards under section 13–21–102.5(3)(a), C.R.S.2008, judgment was entered against

Qwest for a total of $89,867,186, including prejudgment interest.

## II. Exemplary Damages

We conclude that Qwest was entitled to an evidentiary hearing before the trial court increased the exemplary damages award, but reject Qwest's other challenges to the exemplary damages award under both the federal constitution and state law.

Colorado's exemplary damages statute, section 13–21–102, C.R.S.2008, provides:

(1) (a) In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages. The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party.

(b) As used in this section, "willful and wanton conduct" means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff.

. . . .

(3) Notwithstanding the provisions of subsection (1) of this section, the court may increase any award of exemplary damages, to a sum not to exceed three times the amount of actual damages, if it is shown that:

(a) The defendant has continued the behavior or repeated the action which is the subject of the claim against the defendant in a willful and wanton manner, either against the plaintiff or another person or persons, during the pendency of the case. . . .

### A. Constitutionality of Section 13–21–102

Qwest raises a question of first impression by contending that sections 13–21–102(1)(b) and (3)(a) are unconstitutional, both facially and as applied, because they allow juries and trial courts to punish a defendant for actual or potential harm to nonparties, in violation of the due process limitation on exemplary damages announced in *Philip Morris USA v. Williams*, 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007).

 We review the constitutionality of statutes de novo. *E–470 Pub. Highway Auth. v. Revenig*, 91 P.3d 1038, 1041 (Colo. 2004). Because a statute is presumed constitutional, the party challenging it must prove unconstitutionality beyond a reasonable doubt. *Anderson v. Colo. State Dep't of Pers.*, 756 P.2d 969, 975 (Colo.1988). Where two interpretations are possible, one constitutional and the other not, we adopt the constitutional interpretation. *Buckley v. Chilcutt*, 968 P.2d 112, 116 (Colo.1998); *In re Custody of C.M.*, 74 P.3d 342, 344 (Colo.App. 2002).

### 1. Exemplary Damages and Nonparty Harm

 Exemplary damages may properly be imposed to further the state's legitimate interest in punishing unlawful conduct and deterring its repetition. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). However, grossly excessive or indiscriminately imposed exemplary damages constitute an arbitrary deprivation of property. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) *(Campbell)*; *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 42, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (O'Connor, J., dissenting). Such a deprivation violates the Due Process Clause of the Fourteenth Amendment. *Campbell*, 538 U.S. at 416, 123 S.Ct. 1513.

In *BMW*, 517 U.S. at 575, 116 S.Ct. 1589, the Court articulated a three-part due process test for exemplary damages awards: (1) the degree of reprehensibility in the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the exemplary damages award; and (3) the difference between the exemplary damages awarded by the jury and any civil penalties in comparable cases.

Eleven years later in *Philip Morris,* the Court vacated a $79.5 million exemplary damages award because of concern that the jury had improperly considered third-party harm to punish the defendant rather than to determine its reprehensibility. The plaintiff, a cigarette smoker's widow, had argued to the jury:

> [T]hink about how many other Jesse Williams in the last 40 years in the State of Oregon there have been.... In Oregon, how many people do we see outside, driving home ... smoking cigarettes? ... [C]igarettes ... are going to kill ten [of every hundred]. [And] the market share of Marlboros [*i.e.,* Philip Morris] is one-third [*i.e.,* one of every three killed].

549 U.S. at 350, 127 S.Ct. 1057 (alterations in original). The jury was instructed that exemplary damages can be awarded "to punish misconduct and to deter misconduct." *Id.*

Citing *BMW,* the Court held that the "Due Process Clause prohibits a State's inflicting punishment for harm caused strangers to the litigation." *Id.* at 357, 127 S.Ct. 1057. Because the trial court had rejected the defendant's tendered instruction precluding consideration of nonparty harm for punishment, the Court remanded for further proceedings. *Id.* at 351, 358, 127 S.Ct. 1057. It explained that procedures creating an "unreasonable and unnecessary risk" of jury confusion over the distinction between determining reprehensibility and punishing a defendant for nonparty harm are impermissible, and thus "[trial] court[s], upon request, must protect against that risk." *Id.* at 357, 127 S.Ct. 1057.[1]

■ But Qwest's argument that *Philip Morris* permits only "potential harm ... caused *the plaintiff,*" 549 U.S. at 354, 127 S.Ct. 1057 (emphasis in original), to be considered when imposing exemplary damages ignores the context: a lengthy discussion of reasons why "the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties." *Id.*

at 353–54, 127 S.Ct. 1057. When the Court discussed reprehensibility in the very next paragraph, it clarified that both actual and potential harm to others are relevant and may be considered:

> Respondent argues that she is free to show harm to other victims because it is relevant to a different part of the punitive damages constitutional equation, namely, reprehensibility. That is to say, harm to others shows more reprehensible conduct. Philip Morris, in turn, does not deny that a plaintiff may show harm to others in order to demonstrate reprehensibility. Nor do we. Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible—*although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public,* or the converse. Yet for the reasons given above, *a jury may not go further than this and use a punitive damages verdict to punish a defendant* directly on account of harms it is alleged to have visited on nonparties.

*Id.* at 355, 127 S.Ct. 1057 (emphasis added).

The Court closed by observing:

> We have explained why we believe the Due Process Clause prohibits a State's inflicting punishment for harm caused strangers to the litigation. At the same time we recognize that conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few. And a jury consequently may take this fact into account in determining reprehensibility.

549 U.S. at 357, 127 S.Ct. 1057. Because *Philip Morris* involved only argument based on actual nonparty harm, these observations were appropriate to prevent the articulated limitation on punishment from restricting proof of reprehensibility where, as here, the evidence showed only potential nonparty harm.

---

1. On remand, the Oregon Supreme Court affirmed its prior decision on an independent state law ground. *Williams v. Philip Morris,* 344 Or. 45, 176 P.3d 1255 (2008). The Supreme Court granted certiorari in part, —— U.S. ——, 128 S.Ct. 2904, 171 L.Ed.2d 840 (2008), but later dismissed it as improvidently granted, —— U.S. ——, 129 S.Ct. 1436, 173 L.Ed.2d 346 (2009).

Four years earlier in *Campbell,* the Court had set forth factors bearing on reprehensibility, including whether "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others." 538 U.S. at 419, 123 S.Ct. 1513. Yet, *Philip Morris* did not caution that this factor was now limited to actual harm caused nonparties.

We are aware of no case that supports Qwest's narrow interpretation of *Philip Morris* by precluding evidence of potential nonparty harm from being considered in the reprehensibility analysis. One federal circuit has held to the contrary. *See Action Marine, Inc. v. Continental Carbon Inc.,* 481 F.3d 1302, 1320 (11th Cir.2007) (citing *Philip Morris*) ("While punitive damages may not be awarded to punish for harm inflicted on nonparties, we may consider the risk of harm to others as part of the reprehensibility analysis.").

Therefore, we conclude that *Philip Morris* does not preclude such use of potential nonparty harm evidence, and analyze Qwest's facial and as applied challenges on this basis.

### 2. Facial Challenge

■■■ To succeed on its facial constitutional challenge, Qwest must establish that no conceivable set of circumstances exists in which the statute can constitutionally be applied, *i.e.* by considering potential nonparty harm only as to reprehensibility. *Reno v. Flores,* 507 U.S. 292, 301, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Danielson v. Dennis,* 139 P.3d 688, 691 (Colo.2006); *Sanger v. Dennis,* 148 P.3d 404, 411 (Colo.App.2006).

*Philip Morris* neither declared the Oregon exemplary damages statute unconstitutional nor articulated a standard for doing so. Qwest cites no case, and our research reveals none, holding an exemplary damages statute unconstitutional under *Philip Morris.* One court has refused to declare section 13–21–102(1)(b) unconstitutional under *Philip Morris* because it did not create a "significant risk" that the jury awarded exemplary damages based on a desire to punish the defen-

dant for causing injury to nonparties. *Cook v. Rockwell Int'l Corp.,* 564 F.Supp.2d 1189, 1212 (D.Colo.2008).

Even if a test for facial unconstitutionality could be divined from *Philip Morris,* an instruction informing the jury that it *"may* consider the extent of harm suffered by others *in determining what [the] reasonable relationship is"* between the defendant's "punishable misconduct" and harm caused to the plaintiff, but may *"not ... punish the defendant for the impact of its alleged misconduct on other persons, who may bring lawsuits of their own* in which other juries can resolve their claims," sufficiently protects a defendant's due process rights. 549 U.S. at 356, 127 S.Ct. 1057 (emphasis and alteration in original); *cf. Lambrix v. Singletary,* 520 U.S. 518, 530–31, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (holding jury's consideration of facially vague aggravating factor can be cured either by limiting instruction from the court or by appellate review of factor).

Hence, the "rights and safety of others" language in section 13–21–102(1)(b) does not in all cases "create an unreasonable and unnecessary risk of ... confusion," *Philip Morris,* 549 U.S. at 357, 127 S.Ct. 1057, because a jury instruction such as that requested in *Philip Morris* would clarify the purposes for which a jury may properly consider nonparty harm. Therefore, despite the difficulty a jury may have in distinguishing between punishment and reprehensibility,[2] Qwest fails to meet the "no conceivable set of circumstances" requirement of a facial challenge. *Danielson,* 139 P.3d at 691.

To the extent Qwest argues more broadly that section 13–21–102(1)(b) is a mechanism through which the state unconstitutionally "authorize[s] procedures" to allow juries to punish for nonparty harm, *Philip Morris,* 549 U.S. at 357, 127 S.Ct. 1057, comparing the statutory language to similar terminology approved by the Supreme Court shows otherwise.

As noted, under 13–21–102(1)(b), acting in a "willful and wanton manner" means con-

---

**2.** *See* Thomas B. Colby, *Clearing the Smoke from Philip Morris v. Williams: The Past, Present, and Future of Punitive Damages,* 118 Yale L.J. 392,

464 (2008) ("Commentators have tended to agree with the Williams dissenters that that distinction is so elusive as to be nonsensical.").

duct "purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or without regard to the rights and safety of others, particularly the plaintiff." In *Campbell*, the Court described factors that weigh on a defendant's reprehensibility, including whether the "conduct evinced an indifference to or a reckless disregard of the health or safety of others." 538 U.S. at 419, 123 S.Ct. 1513 (citing *BMW*, 517 U.S. at 576–77, 116 S.Ct. 1589).

■ Paralleling its argument concerning a jury's improperly considering nonparty harm under section 13–21–102(1)(b), Qwest asserts that section 13–21–102(3)(a) cannot be applied constitutionally because it permits the trial court to increase an exemplary damages award if the defendant continued the behavior at issue against either the plaintiff "or another person or persons, during the pendency of the case."

But unlike the instruction given in *Philip Morris* informing the jury that exemplary damages are imposed "to punish" the defendant, 549 U.S. at 351, 127 S.Ct. 1057, section 13–21–102(3)(a) does not mention "punish" or "punishment." Hence, it can be interpreted consistently with *Philip Morris* as permitting trial courts to increase an exemplary damages award only if the defendant's conduct is particularly reprehensible because it has continued during the pendency of the case. *See Buckley*, 968 P.2d at 112.

■ Nothing in *Campbell* or *Philip Morris* prevents a trial court from making its own assessment of reprehensibility because "[t]he defendant has continued the behavior," on which to justify the increase. While section 13–21–102(3)(a) is silent as to punishment versus reprehensibility, statutes are not necessarily facially unconstitutional because they are silent regarding distinctions recognized in recent Supreme Court rulings. *See In re Custody of C.M.*, 74 P.3d at 345. Further, trial courts are presumed to correctly apply the law. *Walker v. Casto*, 150 Colo. 332, 334, 372 P.2d 438, 440 (1962).

Accordingly, we conclude that sections 13–21–102(1)(b) and (3)(a) are not facially unconstitutional.

### 3. As Applied Challenge

■■ To succeed on its as applied challenge, Qwest must show that the statute is unconstitutional under the circumstances in which it acted. *Sanger*, 148 P.3d at 410. Holding a statute unconstitutional as applied prevents its future application in a similar context, but does not render it utterly inoperative. *Id.* at 411.

■ Again, Qwest relies on the *Philip Morris* distinction between determining reprehensibility and punishing a defendant based on evidence of nonparty harm. 549 U.S. at 357, 127 S.Ct. 1057. But unlike the defendant in *Philip Morris*, Qwest failed to request an instruction clarifying the difference between determining a defendant's reprehensibility and punishing the defendant for such harm. *Philip Morris* requires only that, "a court, upon request, must protect against that risk" of the jury "seeking, not simply to determine reprehensibility, but also to punish for harm caused strangers." 549 U.S. at 355, 357, 127 S.Ct. 1057. Contrary to Qwest's argument, we discern no basis for equating its in limine motion to exclude evidence that post-accident lack of a routine pole inspection program "poses a risk of harm to nonparties" with a limiting instruction distinguishing reprehensibility from punishment.

Other courts applying *Philip Morris* have treated such a request as a prerequisite to challenging an exemplary damages award based on improper consideration of nonparty harm. *See American Family Mut. Ins. Co. v. Miell*, 569 F.Supp.2d 841, 852–53 (N.D.Iowa 2008) (trial court did not err in omitting from jury instructions distinction between determining reprehensibility and punishing defendant for harm to nonparties where defendant failed to request protective instruction contemplated by *Philip Morris*); *Kauffman v. Maxim Healthcare Services, Inc.*, 509 F.Supp.2d 210, 214–15 (E.D.N.Y. 2007) (submission to jury of exemplary damages claim based, in part, on discrimination directed at nonparties was not error where defendant failed to request protective instruction contemplated by *Philip Morris*); *Rinehart v. Shelter General Ins. Co.*, 261

S.W.3d 583, 598 (Mo.Ct.App.2008) ("The court had no obligation to protect Shelter's due process rights in the absence of such a request.").

Therefore, although Qwest argued constitutionality below, we conclude that it did not sufficiently preserve an as applied challenge to section 13–21–102(1)(b).

Likewise, Qwest argues that the trial court unconstitutionally applied section 13–21–102(3)(a) by increasing the exemplary damages award to punish Qwest for potential harm to nonparties. Qwest preserved this issue in its opposition to Blood's motion to increase exemplary damages. Because we are vacating the order increasing exemplary damages, this issue is no longer before us. On remand, if the trial court again increases exemplary damages, the court should expressly address the punishment/reprehensibility distinction. *Cf. People v. Veren,* 140 P.3d 131, 140 (Colo.App.2005) ("[I]t is imperative that the trial court make some factual record that indicates what causes the statute to be unconstitutional as applied.").

### B. Sufficiency of the Evidence

Qwest next contends the exemplary damages award should be reversed under state law because the evidence is insufficient to establish beyond a reasonable doubt that its conduct was willful and wanton.

■■ The sufficiency of the evidence to justify exemplary damages is a question of law that we review de novo. *Western Fire Truck, Inc. v. Emergency One, Inc.,* 134 P.3d 570, 578 (Colo.App.2006). In deciding this question, the evidence must be viewed in the light most favorable to the party awarded exemplary damages. *Coors v. Security Life of Denver Ins. Co.,* 112 P.3d 59, 66 (Colo. 2005); *Eurpac Service Inc. v. Republic Acceptance Corp.,* 37 P.3d 447, 452 (Colo.App. 2000).

■ Exemplary damages are proper only if the injury was "attended by circumstances of fraud, malice, or willful and wanton conduct." § 13–21–102(1)(a). The proof must be beyond a reasonable doubt. § 13–

25–127(2), C.R.S.2008. Simple negligence cannot support such an award. *Jacobs v. Commonwealth Highland Theatres, Inc.,* 738 P.2d 6, 10 (Colo.App.1986). But where a defendant is conscious of both its conduct and the existing conditions, and knew or should have known that injury would result, the requirements of section 13–21–102 are met. *Coors,* 112 P.3d at 66; *see generally* 1 John J. Kirscher & Christine M. Wiseman, *Punitive Damages: Law and Practice* § 5.3 (2d ed.2000).

■ Colorado law does not support Qwest's assertion that mere lack of a periodic pole inspection program to mitigate the risk created by the inevitable decay of its poles cannot be willful and wanton. *See Millington v. Hiedloff,* 96 Colo. 581, 586–87, 45 P.2d 937, 939 (1935) (describing willful and wanton conduct as "acts and omissions"); *Jacobs,* 738 P.2d at 10 (repeated failure to warn or cure dangerous step in theater sufficient to sustain exemplary damages award); *cf. Coors,* 112 P.3d at 66 (conduct constituting fraud by omission sufficient to sustain exemplary damages award); *see also* Restatement (Second) of Torts § 500 & spec. note (1965)·(stating an "actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act" and noting that such conduct "is often called 'wanton or wilful [sic] misconduct'").

Here, Blood did not present evidence that Qwest had a statutory or regulatory duty to inspect its poles, and Qwest stresses that because no similar accident had ever occurred on a Qwest pole, it lacked notice of the consequences of lack of a periodic inspection program. Yet, Qwest witnesses also agreed that without such a program, some wood utility poles will decay below ground, causing them to lose structural integrity and eventually collapse; Qwest was not relying on Xcel to inspect its poles; the only way to ensure pole climbers' safety is to inspect poles for decay at regular intervals; the collapse of a pole risked serious injury; and other pole failures had occurred, although Qwest did not document the reasons.[3]

---

**3.** These admissions also undercut Qwest's emphasis on pole collapse as "a known risk to

professional linemen" and steps that linemen can take to mitigate it. *See, e.g., Esko v. Lovvold,* 272

The record shows that other utility companies had periodic inspection programs dating back at least fifty years. In addition, the National Electrical Safety Code and Edison Electric Institute, both of which were mentioned in the JUC as "accepted modern methods" of inspection, require periodic inspections.

Some of Qwest's poles had been in the ground for seventy years. Blood's expert estimated that, as a result of the lack of a periodic inspection program and the age of Qwest's poles, between 3,000 and 9,000 poles needed immediate replacement. Qwest's counsel admitted in closing argument, "I wish that I had a good reason to present to you for Qwest's failure to have a joint use pole inspection program, but I don't. I think it would have been prudent for them to have one."

Accordingly, on de novo review but considering this evidence in the light most favorable to Blood, we conclude that a reasonable jury could have found Qwest's lack of a periodic pole inspection program to be willful and wanton beyond a reasonable doubt.

### C. The Amount of the Jury's Exemplary Damages Award

■ Qwest next contends the total $62 million exemplary damages award should be reversed as excessive and disproportionate, in violation of due process under *BMW*, 517 U.S. 559, 116 S.Ct. 1589. Because we are vacating the order increasing exemplary damages, we address only the constitutionality of the jury's $18 million exemplary damages award—slightly less than a 1:1 ratio to compensatory damages.

■ Appellate review of the constitutionality of an exemplary damages award is de novo. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). We analyze *BMW's* three factors independently of our willful and wanton conclusion in Part II(B), *supra*. Unlike our review under state law, for constitutional purposes we do not

defer to the exemplary damages award. *Cooper*, 532 U.S. at 440, 121 S.Ct. 1678.

#### 1. Reprehensibility

■ "[T]he most important indicium of the reasonableness of a[n] [exemplary] damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 575, 116 S.Ct. 1589. This inquiry recognizes that certain wrongs are more blameworthy than others and that exemplary damages should correspond to the "enormity of [the] offense." *Id.* (quotations omitted).

■ Relevant factors include whether (1) the harm involved was physical or economic, *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513; (2) the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others, *Philip Morris*, 549 U.S. at 355, 127 S.Ct. 1057; *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513; *BMW*, 517 U.S. at 576, 116 S.Ct. 1589; (3) the victim was financially vulnerable, *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513; (4) the conduct involved repeated actions or was an isolated incident, *id.*; *BMW*, 517 U.S. at 576–77, 116 S.Ct. 1589; (5) the harm was the result of intentional malice, trickery, or deceit, *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513; *BMW*, 517 U.S. at 576, 116 S.Ct. 1589; (6) the act or omission was to augment profit, *Exxon Shipping Co. v. Baker*, —— U.S. ——, ——, 128 S.Ct. 2605, 2622, 171 L.Ed.2d 570 (2008); *Haslip*, 499 U.S. at 22, 111 S.Ct. 1032; and (7) the conduct involved violence or the threat of violence, *BMW*, 517 U.S. at 575–76, 116 S.Ct. 1589. We apply these factors as follows.

The evidence is undisputed that Qwest's conduct was not the result of intentional malice, trickery, or deceit; it did not involve violence or the threat of violence; and Blood's financial vulnerability, if any, had no bearing on Qwest's decision to forgo a periodic pole inspection program.

Nevertheless, the record also shows that Blood's injuries were physical; Qwest's lack of an inspection program for its 157,000 poles statewide evinced some disregard for the

Or. 27, 534 P.2d 510, 512 n. 2 (1975); *Florida Power & Light Co. v. Robinson*, 68 So.2d 406, 409

(Fla.1953).

safety of other companies' linemen, as well as of persons on the ground who could be injured by a falling pole; while Blood's accident was the first of its kind on a Qwest-owned pole, the lack of an inspection program had been ongoing from 1958 through the date of the accident, *see Willow Inn, Inc. v. Public Service Mut. Ins. Co.*, 399 F.3d 224, 233 (3d Cir.2005) (applying *BMW's* "repeated conduct" factor to conduct that was, in part, nonfeasance); and although no direct evidence showed that Qwest's lack of a periodic pole inspection program was financially motivated, Xcel's costs for periodic pole inspection suggested that not having a similar program saved Qwest between $200,000 and $300,000 annually.

Qwest argues that lack of a periodic inspection program was not reprehensible because: (1) it assumed other companies' linemen would follow pre-climb inspection procedures sufficient to detect decay, as its linemen were trained to do; (2) it believed inspections by its linemen in connection with equipment maintenance were sufficient to monitor the condition of poles; and (3) it understood Xcel was taking remedial action following Blood's injury.

The first assertion has no support in the record. Although Qwest employees testified that they rely on their own pre-climb inspection procedures to detect decay, no direct evidence established that Qwest expected linemen from other utilities to do the same.

Qwest's designated pole climbing safety expert testified consistently with the second assertion. But this testimony was undercut by other evidence that thousands of Qwest poles have never undergone even a pre-climb inspection because Qwest's equipment rarely requires service by a pole climber; prudent utilities have a periodic pole inspection program; pre-climb inspections by linemen are no substitute for periodic ground line inspections; and, as indicated, Qwest admitted that it had no justification for its failure to institute a pole inspection program.

The third assertion is relevant only to Qwest's failure to have implemented a pole inspection program between the date of the accident and the trial. Evidence supporting it can be developed at the remand hearing.

Therefore, while our purely de novo review makes the question a close one, we conclude that sufficient evidence of reprehensibility exists for us to uphold the jury's exemplary damages award.

### 2. Ratio

The second *BMW* guidepost requires that exemplary damages bear a "reasonable relationship" to the compensatory damages award. 517 U.S. at 580, 116 S.Ct. 1589. Although "we cannot[ ] draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case," *id.* at 583, 116 S.Ct. 1589, few awards exceeding a single-digit ratio—that is, 9:1—between exemplary and compensatory damages will satisfy due process. *Campbell*, 538 U.S. at 424–25, 123 S.Ct. 1513.

The Court in *BMW*, 517 U.S. at 581 and n. 33, 116 S.Ct. 1589, and again in *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513, "referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish" as "not binding," but "instructive." In *Exxon*, however, the Court observed, "a legislative judgment that 3:1 is a reasonable limit overall is not a judgment that 3:1 is a reasonable limit in this particular type of case." —— U.S. at ——, 128 S.Ct. at 2632. Ultimately, the Court adopted a 1:1 ratio "as a fair upper limit in such maritime cases," while recognizing that "[t]oday's inquiry differs from due process review." *Id.* at 2633, 2626.

Whether the exemplary damages award in any case complies with due process must be based on the facts and circumstances of that case. *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513. A higher ratio may be justified where particularly egregious misconduct resulted in only a small amount of economic damages, while a lower ratio may reach the outermost limit of the due process guarantee where compensatory damages are substantial. *Id.*

In the context of its challenge to the total exemplary damages award, Qwest empha-

sizes that a substantial compensatory award, as here, suggests "a lesser ratio, perhaps only equal to compensatory damages," may be merited, quoting *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. To the extent this argument challenges even the approximately 1:1 ratio here as too high, none of the cases Qwest cites reduced exemplary damage awards below the level of compensatory damages. *See, e.g., Bach v. First Union Nat'l Bank,* 486 F.3d 150, 156 (6th Cir.2007) (reducing award from ratio of 6.5:1 to 1:1); *Clark v. Chrysler Corp.,* 436 F.3d 594, 608–09 (6th Cir.2006) (reducing award from ratio of 12.7:1 to 2:1); *Boerner v. Brown & Williamson Tobacco Co.,* 394 F.3d 594, 603 (8th Cir. 2005) (reducing award from ratio of 3.7:1 to 1.25:1); *Williams v. ConAgra Poultry Co.,* 378 F.3d 790, 799 (8th Cir.2004) (reducing ratio of 10:1 to 1:1 on one claim, but not disturbing ratio of 2.8:1 on separate claim).

■ Other considerations relevant to the "reasonable relationship" guidepost, some of which duplicate the reprehensibility considerations already discussed, include (1) whether the injury or wrongdoing was hard to detect, increasing the likelihood of the defendant's escaping liability, *BMW,* 517 U.S. at 582, 116 S.Ct. 1589; *Exxon,* 128 S.Ct. at 2622; (2) whether the injury is economic or physical in nature, *Campbell,* 538 U.S. at 426, 123 S.Ct. 1513; *Hampton v. Dillard Dep't Stores, Inc.,* 247 F.3d 1091, 1117 (10th Cir.2001); *Deters v. Equifax Credit Information Services, Inc.,* 202 F.3d 1262, 1273 (10th Cir.2000); (3) the difficulty in determining the monetary value of the noneconomic harm, *BMW,* 517 U.S. at 582, 116 S.Ct. 1589; (4) whether the compensatory award will serve as a deterrent in light of the defendant's financial position,[4] *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462 n. 28, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *Haslip,* 499 U.S. at 22, 111 S.Ct. 1032; *F.D.I.C. v. Hamilton,* 122 F.3d 854, 862 (10th Cir.1997); *Continental Trend Resources, Inc. v. OXY USA, Inc.,* 101 F.3d 634, 641–42 (10th Cir.1996); (5) whether the compensatory award was based on components, such as the plaintiff's "outrage and humiliation," that duplicate the punitive func-

tion of the exemplary damages award, *Campbell,* 538 U.S. at 426, 123 S.Ct. 1513; and (6) the relationship between the exemplary damages award and the harm likely to result from the defendant's conduct, as well the harm that actually occurred, *BMW,* 517 U.S. at 581, 116 S.Ct. 1589; *TXO,* 509 U.S. at 462, 113 S.Ct. 2711.

Applying these considerations here, the record shows that the wrongdoing was hard to detect because only Qwest knew about its lack of a periodic pole inspection program and discovering the decay in P5905, other than through ground line inspection or collapse, was unlikely; Blood's injuries were primarily physical; the jury awarded $1,000,000 for "mental pain and suffering, inconvenience, emotional stress, and impairment of the quality of life," injuries that are difficult to value; and unlike *Campbell,* where the entire compensatory award was based on "a year and a half of emotional distress ... caused by the outrage and humiliation" the plaintiffs suffered, 538 U.S. at 426, 123 S.Ct. 1513, the $1,000,000 noneconomic injury award was less than five percent of the total compensatory award. Insofar as *Philip Morris* did not expressly limit *BMW,* we also note that substantial harm to others could have resulted from Qwest's failure to inspect 157,000 poles statewide over several decades.

Therefore, we conclude that while the compensatory damages awarded were very significant, the jury's approximate 1:1 exemplary damages award bears a reasonable relationship to compensatory damages.

3. Sanctions for Comparable Misconduct

*BMW's* third guidepost concerns disparity between the exemplary damages award and any civil or criminal penalties that may be imposed for comparable conduct. 517 U.S. at 583, 116 S.Ct. 1589. While reviewing courts "should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue," *id.* (internal quotations omitted), courts have

---

4. Because section 13–21–102(6), C.R.S.2008, prohibits considering a defendant's "income or net worth" when "determining the appropriate-

ness or amount of [exemplary] damages," we decline to weigh Qwest's economic position in our federal due process analysis.

"not dwell[ed] long on this guidepost." *Campbell,* 538 U.S. at 428, 123 S.Ct. 1513.

Qwest and Blood agree that Colorado does not impose civil or criminal penalties for the type of conduct at issue, and so do we. Qwest violated contractual and common law tort duties that, unlike violations of federal racketeering or antitrust laws, do not lend themselves to a comparison with statutory penalties. *See Continental Trend,* 101 F.3d at 641. Although Qwest asserts that it believed it had complied with Public Utilities Commission (PUC) telecommunications regulations, it presented no such evidence. Hence, we follow *Campbell* and attach little significance to the absence of penalties here.

Qwest's related argument that it had insufficient notice of exposure to substantial exemplary damages is unpersuasive. Qwest cites no case, nor have we found one, applying general due process notice principles, *see Campbell,* 538 U.S. at 417, 123 S.Ct. 1513, to disturb an exemplary damages award for such lack of notice.

The Colorado exemplary damages statute provides notice of the bases for and extent of potential liability. *See Cook,* 564 F.Supp.2d at 1212. Other cases upholding large exemplary damages awards under Colorado law gave notice to Qwest of its potential exposure. *See Continental Trend,* 101 F.3d at 641 (collecting federal and Oklahoma cases and stating that they provided defendant notice of exposure to exemplary damages); *see also United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.,* 210 F.3d 1207, 1231–33 (10th Cir.2000) (upholding $58 million in exemplary damages awarded under section 13–21–102), *aff'd on other grounds,* 532 U.S. 588, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001); *Coors,* 112 P.3d at 66–68 (imposing exemplary damages award in amount equal to three times compensatory damages based on behavior during pendency of the case).

In sum, we conclude that the jury's exemplary damages award does not violate due process. However, on remand the trial court must perform an independent due process analysis addressing evidence at the remand hearing before it can increase the exemplary damages award. Our conclusion is not in-tended to predetermine that analysis either below or in a second appeal.

**D. Failure to Grant Qwest a Hearing**

We agree with Qwest that the trial court erred by increasing the exemplary damages award without granting it a hearing.

■■■■ "[D]ue process requires advance notice and an opportunity to be heard prior to state action resulting in deprivation of a significant property interest." *Mountain States Tel. & Tel. Co. v. Dep't of Labor and Employment,* 184 Colo. 334, 338, 520 P.2d 586, 588 (1974). The procedural due process requirements in a particular case involve a three-factor balancing test, "(1) the kind of private interest at stake; (2) the risk of an erroneous deprivation of that interest and the probable value of additional or substitute procedures in reducing the risk; and (3) the public or governmental interest involved and the fiscal and administrative burden additional procedural requirements would entail." *Patterson v. Cronin,* 650 P.2d 531, 537 (Colo. 1982).

■■■ A trial court may hold a hearing on a motion in its discretion. C.R.C.P. 121 § 1–15(4); *City & County of Denver v. Ameritrust Co. Nat'l Ass'n,* 832 P.2d 1054, 1059 (Colo.App.1992). In general, where the party against whom the motion is directed had ample opportunity to present written argument, the due process requirements of notice and a reasonable opportunity to be heard have been satisfied. *See BFN–Greeley, LLC v. Adair Group, Inc.,* 141 P.3d 937, 942 (Colo. App.2006); *Pfantz v. Kmart Corp.,* 85 P.3d 564, 570 (Colo.App.2003).

We are aware of no case under section 13–21–102(3) that abrogates a trial court's discretion whether to hold a hearing before increasing an exemplary damages award based on willful and wanton conduct after the accident. But the confluence of this power to increase exemplary damages and the mandate of de novo appellate review under both state and federal law creates a particular need for a complete post-trial record, which

no case in any jurisdiction has addressed.[5]

Here, Blood moved to increase exemplary damages under section 13–21–102(3)(a) because Qwest did not have a periodic pole inspection program during the pendency of the case. Qwest filed a brief in opposition and requested a hearing to present evidence that it had complied with the general practices of the telecommunications industry. After Blood replied in support of the motion, Qwest submitted a statement of anticipated testimony concerning an imminent utility pole inventory and inspection program, although the court had not ordered it to do so. Shortly thereafter and before Blood responded to the statement of anticipated testimony, the court entered its order increasing exemplary damages.

 From a state law perspective, Qwest did not and indeed could not dispute the predicate for Blood's motion: failure to implement a periodic pole inspection program between the filing date and the trial. However, under section 31–21–102(3)(a), exemplary damages can be increased only if Qwest "continued the behavior ... in a willful and wanton manner...." Without a hearing concerning conduct during the pendency of the case, the trial court could not have determined whether "willful and wanton manner" had been proven beyond a reasonable doubt. And without the record from such a hearing, we cannot discharge our state law de novo review duty.

Moreover, from a federal perspective, the lack of a hearing severely limits our ability to conduct the mandatory constitutional de novo review of the order increasing exemplary damages. For example, we do not know whether the reprehensibility of Qwest's failure to implement such a program should be mitigated by its alleged belief that after the accident Xcel linemen were required to implement pre-climb procedures more like those of Qwest; whether Qwest had not done so because removal of all overhead wires and the sole guy line from P5905 before the accident made the circumstances of the accident unique; the extent of Qwest's legal, as opposed to contractual, obligation to inspect its poles, including OSHA regulations; and inspection practices within the telecommunications industry. Nor do we know what additional evidence might be offered concerning factors relevant to the due process implications of the ratio of any increased exemplary damages to compensatory damages, which, as indicated, are high.

The trial court's ruling that Qwest had opened the door to only limited evidence of its post-accident conduct, as discussed in Part III(B), *infra*, did not provide Qwest with an opportunity to develop a complete record during trial on the reasons for its failure to implement a periodic inspection program. Because the court had not ordered Qwest to provide notice of its anticipated testimony, we are unwilling to assume that Qwest would have presented only the evidence set forth in its notice. Without a hearing, we also lack the benefit of trial court findings on the credibility of Qwest's witnesses.

Qwest had a substantial interest in any increase to exemplary damages because a post-trial hearing was its only opportunity further to develop a record for de novo review of an increased award. By creating a complete record of why Qwest had not implemented an inspection program after the accident, such a hearing would have reduced the risk of a due process violation in the increased exemplary damages. And a hearing limited to post-filing conduct would not have imposed a substantial burden on the trial court.

Accordingly, we conclude that the trial court abused its discretion in not granting Qwest a hearing, and thus its order increasing exemplary damages must be vacated. On remand, the trial court shall hold a hearing on Blood's section 13–21–102(3)(a) motion, make findings regarding whether Qwest acted in a willful and wanton manner, *see* section 13–25–127(2), and, if it increases the exemplary damages, address the due process

---

5. The dearth of such cases suggests that Colorado's two-tiered approach to awarding exemplary damages is unusual, if not unique.

factors discussed in Parts II(C)(1), (2), and (3), *supra.*

### III. Qwest's Post–Accident Conduct

Qwest next contends the trial court erred by denying its mistrial motion following Blood's closing argument and its C.R.C.P. 59 motion asserting that Blood violated a pretrial in limine order by offering evidence and presenting argument regarding Qwest's post-accident lack of a periodic pole inspection program. We disagree.

A trial court's decision on C.R.C.P. 59 motions and mistrial motions will not be reversed absent an abuse of discretion. *School Dist. No. 12 v. Security Life of Denver Ins. Co.,* 185 P.3d 781, 786–87 (Colo. 2008) (C.R.C.P. 59 post-trial motion); *Genova v. Longs Peak Emergency Physicians, P.C.,* 72 P.3d 454, 463 (Colo.App.2003) (mistrial motion). A trial court abuses its discretion only if it acts in a manifestly arbitrary, unreasonable, or unfair manner. *School Dist. No. 12,* 185 P.3d at 787.

### A. Violation of the In Limine Ruling

Before trial, Qwest obtained an order excluding any evidence or argument concerning the post-accident absence of a routine pole inspection program and the resultant risk of future injuries like Blood's to others. *See* CRE 103(a)(2); *Uptain v. Huntington Lab, Inc.,* 723 P.2d 1322, 1330–31 (Colo.1986) (pretrial motion in limine sufficiently preserves issue for appeal; contemporaneous trial objection unnecessary).

Violation of an in limine order warrants a new trial only if the violation is clear and sufficiently prejudicial. *Van Schaack v. Van Schaack Holdings, Ltd.,* 856 P.2d 15, 24 (Colo.App.1992), *aff'd on other grounds,* 867 P.2d 892 (Colo.1994).

Here, Qwest points to action by Blood that it asserts violated the in limine order, through either express reference to post-accident conduct or use of the present tense. For example:

- Blood asked his first witness, who was Qwest's designated pole climbing safety expert, "[W]ould you agree that, to your knowledge, there is no practice at Qwest where Qwest periodically goes out and inspects its utility poles?"

- Blood also asked this witness, "[D]o you know why almost three years after Andy was injured, Qwest hasn't gone out and done the kind of inspection you told us every technician should do?"

- Blood asked his expert witness on pole safety, "Do you have any opinion of the range of [sic] percentage of Qwest's poles that currently are [sic] in need of immediate replacement?"

But other references Qwest raises to post-accident conduct are temporally ambiguous. For example:

- During opening statement, Blood summarized the anticipated testimony of a witness, saying, "[t] he whole time he worked there—he started working there in 1973—the whole time he worked there, he didn't ever know of such a program."

- In cross-examining one of Qwest's witnesses, Blood asked, "In your work here, you found no evidence that Qwest has ever employed a routine, periodic inspection program, have you?"

Blood's opening statement included temporally limiting remarks, such as, "Qwest for more than 40 years before Andy was injured consistently failed to comply with this obligation"; "Qwest did not find any records relating to the inspection ... from the date of the pole's installation in 1958 to June 29th, 2004"; and, "Qwest has no records showing a scheduled, routine, inspection plan ... between the date that contract was signed ... and the date Andy Blood fell over." The trial court did not sustain Qwest's objection during Blood's opening statements based on a violation of the in limine order, but only cautioned the jury that opening statements are not evidence.

Blood expressly focused the first witness on the proper time frame: "All the questions I'm going to ask you, unless I say differently, will relate to the time period from [the accident date] and before, okay?" He repeatedly referenced this time frame in questioning his expert.

Approximately six of Qwest's objections based on the in limine order were sustained. *See Mahan v. Capitol Hill Internal Medicine P.C.*, 151 P.3d 685, 689 (Colo.App.2006) (court may properly deny a request for a new trial if it sustains objections to allegedly prejudicial line of questioning). Thereafter, Blood reframed some questions with the preface, "Before June 29, 2004," or, "Prior to June 2004."

Thus, because Blood attempted to keep witnesses temporally confined, corrected questions after objections were sustained, and asked only a limited number of clearly improper questions over eight days of trial, we conclude that the trial court did not abuse its discretion in denying the mistrial motion. Hence, we decline to address Blood's argument that the jury should have been allowed to hear evidence of post-accident conduct. *But see Bennett v. Greeley Gas Co.*, 969 P.2d 754, 761 (Colo.App.1998) (acts of wrongdoing occurring after the event creating liability ordinarily are not material to the jury's award of exemplary damages).

### B. Closing Argument

Qwest also argues that the following statements at the end of Blood's initial closing argument violated the in limine order by improperly referencing its post-accident conduct:

> Qwest still, today, does not have a program for inspecting, maintaining, and repairing its telephone poles.
>
> . . . .
>
> Your verdict sends a message that says you must pay for what you did and you must pay some punishment because you continue to do it.
>
> . . . .
>
> [I]f sometime in the future we were to see [a Qwest representative] and we were to say to him, . . . do you have an inspection and maintenance and repair program?

But this argument was consistent with the court's ruling near the end of evidence presentation that Qwest had opened the door to its post-accident conduct by offering testimony about its ongoing contractual relationship with Xcel. *See generally Itin v. Ungar*, 17

P.3d 129, 132 n. 4 (Colo.2000) ("[O]pening the door" "often occurs when one party introduces evidence that causes another party to introduce counterproof that would otherwise be inadmissible but for the first party's introduction of the subject matter."). Qwest's challenge to this ruling fails.

Immediately before this ruling, Qwest had asked one of its employees several questions that concerned events occurring after the accident, including: (1) "Now, since your testimony last week, have you gone to see if this net compensation program [between Xcel and Qwest] is still the same?"; (2) "How are you handling it differently now than you were before, when it was on the net compensation system?"; (3) "Now, is [Xcel] since 2005 making monthly payments to Qwest?"; and (4) "[H]as there ever been a time when [Xcel] has refused a payment Qwest has made for [Xcel] to use [Xcel] poles?"

Blood and Xcel then sought and the trial court granted permission for "a very limited inquiry" into the continued lack of a periodic pole inspection program. Blood asked the Qwest witness one question about not routinely inspecting its poles since the date of the accident and one similar question of the next witness, an Xcel employee.

Although not directly related to post-accident pole inspection, which was the subject of Qwest's in limine motion, the questions just before the ruling involved post-accident dealings between Qwest and Xcel. In addition, earlier Qwest had asked expert witnesses broader questions concerning post-accident pole inspection procedures, such as (1) "[I]s [that] the process that is today's standard inspection for some utility companies?"; (2) "Even though this is the best that is out there today, you still miss 1 percent of the unsound poles that are out in the field?"; and (3) "They [safety concerns and safety tools] haven't changed still today, have they?"

Therefore, the trial court's allowing very limited questions because Qwest had opened the door was not an abuse of discretion. *See Hock v. New York Life Ins. Co.*, 876 P.2d 1242, 1251, 1257 (Colo.1994).

When Qwest objected and moved for a mistrial immediately after Blood's initial clos-

ing argument ended, the court issued a curative instruction warning the jury, "[T]he only conduct of Qwest that can be considered in relation to punitive damages is the conduct prior to the date of the accident, that is prior to June 29th, 2004, that is the law." Qwest did not and does not challenge the wording of this instruction. *See Cook Inv. Co. v. Seven–Eleven Coffee Shop, Inc.*, 841 P.2d 333, 335 (Colo.App.1992) (declining to reverse for denial of a mistrial motion, noting "the improper statement was made only once" and "the trial court issued an immediate curative instruction"). The court also cautioned the jury that arguments or statements of counsel are not evidence. *Cf. Gross v. B.G. Inc.*, 7 P.3d 1003, 1006 (Colo.App.1999) (misstatements of law in closing argument did not require a mistrial where jury was instructed to follow law as explained by the court), *aff'd*, 23 P.3d 691 (Colo.2001).

In rebuttal closing, Blood expressly confined his argument to the period up "until June 29th, 2004." *See Ortivez v. Davis*, 902 P.2d 905, 908 (Colo.App.1995) (upholding denial of mistrial motion, in part, because improper reference was not repeated).

In light of the court's "opened the door" ruling and these curative measures, we conclude that denial of Qwest's mistrial motion was not an abuse of discretion. *See Armentrout v. FMC Corp.*, 842 P.2d 175, 187 (Colo.1992) (juries are presumed to follow court's instructions).

### IV. The Joint Use Contract

We next address and reject Qwest's contentions that arise from denial of its post-trial motions concerning obligations and rights under the JUC, again reviewing for abuse of discretion.

#### A. References to JUC Article XII

As pertinent here, Article XII provides:

LIABILITY AND DAMAGES. Whenever any liability is incurred by either or both of the parties hereto for damages for injuries to the employees or for injury to the property of either party, or for injuries to other persons or their property, arising out of the joint use .of poles under this agreement, or due to the proximity of the wires and fixtures of the parties hereto attached to the jointly used poles covered by this agreement, the liability for such damages, as between the parties hereto, shall be as follows:

(a) Each party shall be liable for all damages for such injuries to persons or property caused solely by its negligence or solely by its failure to comply at any time with the specifications herein provided for. . . .

(b) Each party shall be liable for all damages for such injuries to its own employees . . . as are caused by the concurrent negligence of both parties or that are due to causes which cannot be traced to the sole negligence of the other party.

Qwest moved in limine under CRE 402, 403, and 411 to exclude any reference to Article XII. The trial court ruled that this provision was irrelevant to the jury's resolution of the third-party claim and counterclaim for breach of the JUC because, "[t]he jury is to consider fault allocation predicated on the conduct of the parties which may have caused the accident, while allocation of damages occurs by operation of law after the jury determines the relative fault of the parties." The order did not preclude general references to blame shifting.

Blood and Xcel sought permission to explain in closing arguments that Qwest was seeking damages from Xcel through its third-party breach of contract claim. The court agreed, "as long as it's limited." Qwest asserts that it was denied a fair trial because the trial court permitted, and Blood and Xcel made, improper argument concerning Article XII.

■■ A trial court's decisions regarding the scope of closing arguments will not be disturbed absent an abuse of discretion. *See Brown v. Kreuser*, 38 Colo.App. 554, 559, 560 P.2d 105, 109 (1977).

Section 13–21–111.5(5), C.R.S.2008, provides:

In a jury trial in any civil action in which contributory negligence or comparative fault is an issue for determination by the jury, the trial court shall instruct the jury

on the effect of its finding as to the degree or percentage of negligence or fault as between the plaintiff or plaintiffs and the defendant or defendants. However, the jury shall not be informed as to the effect of its finding as to the allocation of fault among two or more defendants. The attorneys for each party shall be allowed to argue the effect of the instruction on the facts which are before the jury.

■ Here, because Qwest raised comparative negligence as an affirmative defense and the jury was instructed to apportion negligence among Blood, Qwest, and Xcel, Blood was entitled to argue that Qwest should be held wholly responsible. Likewise, because Qwest had pleaded breach of the JUC against Xcel, the latter was entitled to inform the jury that Qwest sought to hold Xcel responsible for Blood's injuries. Although Qwest asserts that Blood and Xcel impermissibly "informed [the jury] as to the effect of its finding" Qwest 100% at fault, we conclude that Blood and Xcel merely "argue[d] the effect of the [trial court's] instruction on the facts" of the case. § 13–21–111.5(5). Hence, we discern no abuse of discretion by the trial court in allowing such limited argument.

Nor did closing argument of either Blood or Xcel so exceed the bounds of the trial court's order that denial of post-trial relief was an abuse of discretion. Neither of them told the jury that Qwest would fully escape liability if Xcel was found even partly liable or referred to Article XII, which had been redacted from the jury's copy of the JUC.

Qwest points to the following portion of Blood's initial closing argument:

> Why so many defenses, including the last one, which is Qwest sues [Xcel] and wants [Xcel] to pay everything Qwest must pay Andy Blood?
>
> . . . .
>
> The purpose of Qwest bringing [Xcel] in is to shift responsibility, is to be less than fully responsible for their conduct. That's what Qwest is hoping you will do.
>
> . . . .
>
> Qwest must be held 100% percent responsible because the only way Qwest will

be responsible is if you make them fully responsible.

These passages are a small portion of an argument that encompassed forty pages of transcript. *See People v. Griffith,* 58 P.3d 1111, 1114 (Colo.App.2002) (allegedly improper statements "a small part of a lengthy closing argument"); *Seven–Eleven,* 841 P.2d at 334; *Smith v. JBJ Ltd.,* 694 P.2d 352, 353 (Colo.App.1984) (allegedly improper argument is "consider[ed] . . . in the totality of the closing argument"). And, as indicated, Qwest's responsibility for the condition of P5905 lay at the heart of the case.

Qwest also points to the following portion of Xcel's closing argument:

> But [Qwest] did make another business decision. . . . It was to file a lawsuit against [Xcel] and shift that responsibility to [Xcel].
>
> . . .
>
> So this plan that Qwest has developed that leads to this lawsuit is basically this: We save millions not inspecting our poles from 1960 onward, and we're going to take the very contract that required us to do those inspections and we're going to use it against [Xcel]. And we're going to use this contract to make them responsible for our rotten pole. . . .
>
> They're not going to be accountable if the jury finds in favor of Qwest against [Xcel] on this breach of contract claim.

But Xcel's closing argument was also lengthy, encompassing twenty-four pages. *See Griffith,* 58 P.3d at 1114; *Seven–Eleven,* 841 P.2d at 334.

Moreover, Qwest asserted that Xcel was negligent, and the comparative negligence apportionment instruction included Xcel. Qwest's closing argument urged the jury to conclude that misinformation to and inadequate training of linemen by Xcel caused Blood's injury because, among other things, "[Xcel] knew that poles that were in the condition of pole 5905 created special concern or should for linemen." Xcel's argument that the evidence did not allow Qwest to "shift th[e] responsibility" was a proper response.

**324**

Further, the jury was instructed to decide by special verdict, "Were Andrew Blood's injuries caused solely by the negligence of Qwest, or solely by Qwest's failure to comply with the specifications of the Joint Use Contract?" This instruction expressed a nexus between "Qwest's failure" and "Blood's injuries." Thus, Xcel's "shift[ing] ... responsibility" argument was also proper under this instruction, to which Qwest did not object.

Accordingly, we conclude that the trial court did not abuse its discretion concerning the scope of closing argument and that the ensuing arguments of Blood and Xcel did not require a new trial.

### B. Submitting Material Breach to Jury

Qwest next contends the trial court erred in denying its post-trial motion because the court should not have allowed the jury to decide whether Qwest had materially breached or not substantially performed the JUC. According to Qwest, under the plain language of the agreement only reciprocal pole use, not inspection and maintenance, was the essence of the contract. Alternatively, Qwest contends the evidence was insufficient to support the jury's finding that Qwest materially breached the JUC.

■■■■ To the extent that Qwest asserts an error of law under C.R.C.P. 59(d)(6) in submission of these issues to the jury, a trial court must submit a claim to the jury if a reasonable jury could return a verdict for the party asserting the claim. *See Mile Hi Concrete, Inc. v. Matz,* 842 P.2d 198, 205 n. 14 (Colo.1992). When reviewing such a decision, we view the evidence in a manner most favorable to the prevailing party. *Roberts v. Holland & Hart,* 857 P.2d 492, 499 (Colo. App.1993).

■■■■ Under this standard, Qwest's assertion that the JUC language requires the conclusion that its lack of a periodic inspection program was an immaterial breach is unpersuasive. Generally, materiality of a contract breach is a question of fact. *Coors,* 112 P.3d at 64. What obligations go to the essence of the contract must be assessed by the trier of fact based on the parties' expectations when the contract was formed. *Id.*

Here, a reasonable jury could have concluded that inspection and maintenance of poles was material because Xcel would not risk failure of its electrical transmission system by hanging wire and other equipment on uninspected and potentially defective Qwest poles.

We also reject Qwest's further arguments that the trial court should have kept material breach from the jury because (1) Xcel waived the breach by continuing to perform under the JUC even after having learned of Qwest's failure to inspect and maintain P5905, and (2) violation of the "safe and serviceable condition" specification is a basis for imposing liability on the noncomplying party under Article XII(a), but not a ground for terminating the JUC.

■■■ Like materiality, waiver is generally a question of fact. *Matoba v. Blackhawk Enterprises,* 701 P.2d 604, 606 (Colo.App. 1984). Here, even assuming commencement of this action notified Xcel that Qwest lacked an inspection program, a material breach does not obligate the nonbreaching party— here, Xcel—to terminate the contract. Rather, that party can continue performing its own obligations and insist the other party do likewise. *See Poudre River Oil Corp. v. Carey,* 83 Colo. 419, 424, 266 P. 201, 202–03 (1928); *see also Colorado Structures, Inc. v. Insurance Co. of the West,* 161 Wash.2d 577, 167 P.3d 1125, 1132 (2007) (material breach permits, but does not require, nonbreaching party to cancel or terminate contract).

This analysis is supported by JUC Article XI(a), which provides:

> The failure of either party to enforce, insist upon, or comply with any of the terms, conditions or provisions of this Agreement, on its waiver of the same in any instance or instances, shall not be construed as a general waiver or relinquishment of any such terms, conditions, or provisions, *but the same shall be and remain at all times in full force and effect.*

(emphasis added).

Thus, a violation of the "safe and serviceable condition" specification could be a material breach, but upon Xcel's election to continue performing, it would also be a basis for

shifting liability to the nonemploying party under Article XII(a). Hence, Article XII(a) did not preclude the jury from deciding whether Qwest materially breached the JUC by never having inspected any of its jointly-used poles.

■■■ Qwest's alternative argument that the evidence was insufficient to permit the jury to find material breach fares no better. "[A] jury's verdict will not be disturbed if there is any support for it in the record." *Murphy v. Glenn,* 964 P.2d 581, 584 (Colo. App.1998).

■■■ Article I of the JUC, "Scope of Agreement," mandates: "The procedures that shall be followed by the parties hereto in connection with the joint use of poles shall be in accordance with . . . Appendix B." In turn, Appendix B of the JUC provides that the pole owner "shall . . . maintain its poles in a safe and serviceable condition," and "shall determine by suitable inspection the necessity for the replacement of all such poles." *See Burns v. Board of Assessment Appeals,* 820 P.2d 1175, 1178 (Colo.App.1991) ("shall" connotes mandatory meaning).

Three Qwest employees testified without objection that Qwest's lack of a periodic inspection program violated the JUC's "safe and serviceable condition" specification. One of them also testified that she thought the provision was a material term of the JUC. This evidence was sufficient to support the jury's finding of material breach.

Further, even if the trial court should have directed a verdict for Qwest on the material breach counterclaim, the jury could still have determined by a special verdict on the comparative negligence defense that Qwest was 100% at fault for Blood's injuries. The jury was not instructed to measure negligence based on Qwest's material breach.

The disjunctive language of Article XII(a), quoted in Part IV(A), *supra,* makes a party liable for all damages, even to the other party's employee, if caused by either its sole negligence "or" its sole failure to comply with the specifications in the JUC. Thus, the jury's finding Qwest 100% negligent would have made it solely liable for Blood's injuries, leaving Qwest with no basis under Article XII(a) to impose liability on Xcel, even if it had not materially breached the JUC.

Accordingly, we conclude that the trial court did not err by denying Qwest post-trial relief as to the JUC.

## C. Jury's Verdict Holding Qwest 100% Culpable

■■■ Qwest's contention that the trial court erred by failing to grant judgment notwithstanding the verdict because the jury's finding Qwest 100% at fault cannot be reconciled with the evidence is contrary to the record.

"It is the jury's sole province to determine the weight of the evidence and the credibility of witnesses, and to draw all reasonable inferences of fact therefrom." *Morales v. Golston,* 141 P.3d 901, 906 (Colo.App.2005).

Here, the jury's verdict included:

Was [Xcel's] negligence a cause of [Blood's] injuries? (Yes or No)

ANSWER: No

Were [Blood's] injuries caused solely by Qwest's failure to comply with the specifications of the Joint Use Contract?

ANSWER: Yes

Were [Blood's] injuries caused solely by the negligence of Qwest, or solely by Qwest's failure to comply at any time with the terms of the Joint Use Contract relating to Pole 5905? (Yes or No)

ANSWER: Yes

Sufficient evidence supports these portions of the verdict.

First, as previously discussed under Part II(B), *supra,* evidence showing Qwest's willful and wanton conduct supports these causation determinations. Second, a reasonable juror could have determined that Xcel and Blood acted reasonably from the following evidence.

Both Qwest and Xcel employees testified that to climb a pole without guy lines or external support from maintenance equipment is safe if the pole appears structurally sound based on the pre-climb inspection, even when the pole has been stripped of

overhead lines that may have provided some lateral support. ·

Blood had performed pre-climb inspections on and then climbed approximately 1,500 poles. He testified that he had performed a pre-climb inspection on P5905 and believed it was structurally sound. Another Xcel employee who had worked on the pole earlier the day of the accident also testified that the pole appeared to be sound.

Blood's expert testified that P5905 failed because of "brown rot decay extending from approximately two to three inches below the ground line down some depth." The expert explained that this decay could not have been detected by routine pre-climb inspections, and opined that if Blood had performed a "typical" pre-climb inspection, the expert did not "see anything that would [have] indicate[d] that [P5905] was unsafe to climb."

Contrary to Qwest's assertion, the verdict need not be set aside because Xcel's "Root Cause Report"—based on its investigation of the accident—states that Xcel employees did not follow internal Safety Rule 307.02, requiring poles to be "securely guyed or otherwise adequately supported" when removing equipment. Qwest cites no case, and we have found none in Colorado, holding that violation of an internal company rule is negligence as a matter of law. Instead, Colorado cases limit this principle to legislative enactments. *Compare Lombard v. Colorado Outdoor Educ. Center, Inc.*, 187 P.3d 565, 572 (Colo.2008) ("The underlying principle of the common law doctrine of negligence per se is that legislative enactments such as statutes and ordinances can prescribe the standard of conduct of a reasonable person such that a violation of the legislative enactment constitutes negligence."), *with Flechsig v. United States*, 991 F.2d 300, 304 (6th Cir.1993) (violation of internal operating procedure not negligence per se).

Moreover, because Qwest never asked for an instruction that the report was a binding admission, the jury could weigh it against the contrary testimony of Xcel employees. *Ovation Plumbing, Inc. v. Furton*, 33 P.3d 1221, 1224–25 (Colo.App.2001) ("[I]f there is evidence in the record, the weight of evidence, credibility of witnesses, and reasonable infer-

ences to be drawn from the evidence are within the jury's exclusive province.").

Thus, because the record permitted the jury to find that Xcel and Blood were not negligent and Qwest was 100% liable for Blood's injuries, we conclude that the trial court did not err by denying Qwest's motion for judgment notwithstanding the verdict.

### D. Jury Instruction on Xcel's Responsibilities

Qwest next contends the trial court should have set aside the verdict based on error in Instruction No. 2 because (1) PUC Rule 21 provided, "[e]ach pole ... must be inspected by the utility owning or using it with sufficient frequency to determine the necessity for replacement or repair" (version in effect until 2006); and (2) Xcel had a duty to assure that P5905 could be climbed safely. This contention fails under the law of the case and invited error doctrines.

 Generally, a party has the right to rely on orders of the court as law of the case. *Ehrlich Feedlot, Inc. v. Oldenburg*, 140 P.3d 265, 272 (Colo.App.2006). Prior relevant rulings made in the same case should be followed. *Brodeur v. American Home Assur. Co.*, 169 P.3d 139, 149 (Colo. 2007).

As relevant here, Instruction No. 2 stated:

> In 1960 Defendants' Qwest predecessor company entered into an agreement for the joint use of utility poles with [Xcel]. It has been determined, based upon contractual provisions, that [Xcel] did not become responsible for the condition of pole 5905 at any time.

Qwest objected, arguing: "We believe that's an incorrect statement to the holdings of this case and incorrect statement of law and the jury should not be told that." It tendered an alternative instruction omitting the second sentence, which the trial court rejected.

The court's instruction paralleled its earlier order on Qwest's "Motion for Determination of Law Regarding [Xcel's] Assumption of Duty," which concluded: "[B]ased upon the relevant contractual provisions and the language used, [Xcel] did not become respon-

sible for the condition of P5905 at any time." Qwest has not appealed this order. Thus, the language in this instruction to which Qwest objected was the law of the case.

■■■ A court should not follow the law of the case if doing so would produce legal error. *See Pearson v. Dist. Court*, 924 P.2d 512, 515 (Colo.1996). However, we need not decide if PUC Rule 21 precludes using the earlier order to uphold this instruction because Qwest concedes that it failed to call the court's attention to Rule 21 until it responded to Blood's post-trial motion to increase exemplary damages. *See* C.R.C.P. 51 (parties must object to jury instructions before submission of the instructions to the jury, and "[o]nly grounds so specified shall be considered on ... appeal"); *Bear Valley Church of Christ v. DeBose*, 928 P.2d 1315, 1330–31 (Colo.1996).[6]

■■■ Further, Qwest invited any error in Instruction No. 2 when its counsel stated to the court, "You think I'm going to argue [Xcel] had an obligation in their pole inspection program to go look at pole 5905? I won't," and submitted a jury instruction, which the court gave, stating: "Qwest is not asserting that [Xcel] was negligent in any inspection of any Qwest owned joint use pole performed as part of [Xcel's] joint use pole inspection program." *See Horton v. Suthers*, 43 P.3d 611, 618 (Colo.2002) (invited error doctrines preclude parties from taking positions inconsistent with those initially taken); *People v. Gregor*, 26 P.3d 530, 532 (Colo.App. 2000) (instruction proposed by the defendant triggered invited error).

Even if some statutes might require a verdict be set aside as a matter of public policy notwithstanding invited error, Qwest cites no case, and we have found none in Colorado, doing so based only on an administrative rule. Qwest's citation to *Public Service Co. v. United Cable Television, Inc.*, 816 P.2d 289, 291 (Colo.App.1991), *rev'd*, 829 P.2d 1280 (Colo.1992), is unpersuasive because the quoted statement of a "nondelegable duty" is dictum.

Accordingly, we decline to disturb the verdict based on Instruction No. 2.

## V. Qwest's Affirmative Defenses

Finally, we reject Qwest's contention that the trial court erred in denying its post-trial motions based on the WCA and the PLA.

### A. Workers' Compensation Act

■■ We agree with the trial court that Qwest waived its exclusivity defense under WCA section 8–41–102. *See Dee Enterprises v. Indust. Claim Appeals Office*, 89 P.3d 430, 432 (Colo.App.2003) ("[WCA] is the exclusive remedy for workers injured within the scope and course of their employment and precludes employees from bringing tort actions against their employers.").

Among its affirmative defenses in the answer, Qwest pleaded that Blood's claims "may be barred or limited by the Colorado [WCA]." But the trial management order did not list the WCA among six other enumerated affirmative defenses. Nor did Qwest raise the WCA during trial.

After the verdict but before entry of judgment, Qwest moved to dismiss the action for lack of subject matter jurisdiction, arguing that although Blood worked for Xcel, Qwest was Blood's statutory employer under the WCA. *See* §§ 8–41–401(1)(a), 402(1), C.R.S. 2008. The trial court denied the motion, explaining:

> The burden to plead and prove the affirmative defense was on defendant Qwest. At trial [Qwest] did not put on evidence to support the defense and as a result the burden was not met. The issue of Workers' Compensation was not raised at trial and has been presented much too late.

#### 1. Affirmative Defense or Jurisdictional Defense

■■■ We first reject Qwest's argument that the WCA is a nonwaivable jurisdictional defense which can be raised at any time. *See Skyland Metro. Dist. v. Mountain W. Enter., LLC*, 184 P.3d 106, 115 (Colo.App.

---

**6.** Qwest may raise PUC Rule 21 at the remand hearing and argue that it weighs against increasing exemplary damages.

2007) (a court's subject matter jurisdiction is an issue that may be raised at any time). We review a question of subject matter jurisdiction de novo. *In re J.C.T.*, 176 P.3d 726, 729 (Colo.2007).

Relying on *Town of Carbondale v. GSS Properties, LLC*, 169 P.3d 675, 682 (Colo. 2007) ("[I]f preemption 'affects the choice of forum rather than the choice of law,' then preemption is akin to a jurisdictional challenge and therefore is not waivable."), Qwest argues that exclusivity of workers' compensation is a jurisdictional defense because, if applicable, the WCA changes the forum by vesting administrative law judges (ALJs) with sole jurisdiction to decide workers' compensation disputes. *See* § 8–43–201, C.R.S. 2008. However, *Town of Carbondale* did not involve the WCA.

In *Packaging Corp. v. Roberts*, 169 Colo. 316, 320, 455 P.2d 652, 654 (1969), the supreme court rejected a similar argument that the district court lacked jurisdiction until the Industrial Commission had determined the plaintiff was not an employee, because "the district court had jurisdiction to determine whether the plaintiff was an employee at that time." *See also Radil v. Sanborn Western Camps, Inc.*, 384 F.3d 1220, 1226–27 (10th Cir.2004) (the WCA "does not implicate ... subject matter jurisdiction" where "the application of the exclusivity defense bar is disputed").

We agree with divisions of this court that have rejected Qwest's jurisdictional argument. *See Schwindt v. Hershey Foods Corp.*, 81 P.3d 1144, 1148 (Colo.App.2003) (holding that a motion to dismiss under the exclusivity provision of the WCA "does not go to the subject matter jurisdiction of the court"); *Bigby v. Big 3 Supply Co.*, 937 P.2d 794, 799 (Colo.App.1996) ("unlike a jurisdictional issue, which can be raised at any time, the exclusivity of workers' compensation is an affirmative statutory defense which must be timely raised, or it is waived"); *cf. Popovich v. Irlando*, 811 P.2d 379, 385 (Colo.1991)

(the "co-employee immunity rule constitutes an affirmative defense" under the WCA).

Qwest's citation to broad pronouncements of ALJs' "original jurisdiction" under the WCA is unpersuasive because in those cases the circumstances giving rise to administrative jurisdiction were undisputed. *See, e.g., MGM Supply Co. v. Indus. Claim Appeals Office*, 62 P.3d 1001, 1003 (Colo.App.2002) ("[c]laimant sustained an admitted industrial injury" and after claimant was placed at maximum medical improvement, "[e]mployer filed a final admission consistent with the treating physician's rating"); *Colo. Compensation Ins. Auth. v. Baker*, 955 P.2d 86 (Colo. App.1998) (claim to recover benefits erroneously paid to claimants subject to exclusive administrative jurisdiction).[7]

### 2. Waiver

We next reject Qwest's argument that even if exclusivity of the WCA is waivable, the trial court erred in finding that Qwest had waived this defense by failing to raise it during trial.

"In the absence of unusual circumstances, issues raised in the pleadings but not presented at trial will not serve as a basis for review." *Minto v. Lambert*, 870 P.2d 572, 575 (Colo.App.1993); *see also Borquez v. Robert C. Ozer, P.C.*, 923 P.2d 166 (Colo.App. 1995) (declining to address exclusivity of the WCA because defendants raised the affirmative defense in amended answer and trial disclosure certificate, but not during trial), *aff'd in part and rev'd in part on other grounds*, 940 P.2d 371 (Colo.1997).

Qwest cites no case and we have found none in Colorado granting appellate review of an affirmative defense that, as here, was pleaded but not raised during trial, merely because it was presented in a post-trial motion. Statements in cases such as *Borquez*, 923 P.2d at 172, and *Highland Meadow Estates at Castle Peak Ranch, Inc. v. Buick*,

---

7. Qwest's reliance on *Harris v. Vernier*, 242 Mich. App. 306, 617 N.W.2d 764, 768 (2000) (holding "that a party's assertion of the exclusive remedy provision of [Michigan's WCA] is a direct challenge to the trial court's subject-matter jurisdiction, not within the scope of the waiver"), is misplaced. Unlike in *Harris*, where the court concluded that prior Michigan cases "did not squarely determine" whether the exclusive remedy provision constituted "a challenge to the trial court's subject-matter jurisdiction," *id.* at 769, the issue has been addressed in Colorado.

994 P.2d 459, 462 (Colo.App.1999), *aff'd in part and rev'd in part*, 21 P.3d 860 (Colo. 2001), that the defense *also* was not raised in a post-trial motion fail to establish the converse: that doing so preserves it for appeal.

Analogous federal cases reject Qwest's position. *See Bennett v. City of Holyoke*, 362 F.3d 1, 6 (1st Cir.2004) (while affirmative defense was argued post-judgment, the court held that "[s]imply mentioning a possible defense in an initial pleading, without further development in subsequent stages of the proceedings, does not preserve it for post-trial review"); *Violette v. Smith & Nephew Dyonics, Inc.*, 62 F.3d 8, 11 (1st Cir.1995) (where an affirmative defense was argued after the jury returned an adverse verdict, the court held that "[a]lthough [the defendant] pleaded ... an affirmative defense in its answer, it neither developed a record on the issue nor pressed it in any fashion before the district court").

Moreover, Blood notes factual issues concerning Qwest's status as a statutory employer under sections 8–41–401(1)(a) and 8–41–402(1), such as: (1) whether Blood's removal of Xcel attachments from P5905 was work done in the ordinary course of Qwest's business, *see Thornbury v. Allen*, 39 P.3d 1195, 1198 (Colo.App.2001) ("The test for determining whether an alleged employer is a 'statutory employer' under § 8–41–401(1)(a) is whether the work contracted out is part of the employer's 'regular business' as defined by its total business operation."); and (2) whether P5905 constituted real property or an improvement thereon owned by Qwest under section 8–41–402(1) ("Every ... corporation owning any real property or improvements thereon and contracting out any work done on and to said property to any contractor, subcontractor, or person who hires or uses employees in the doing of such work shall be deemed to be an employer ...."). As to the former, and contrary to Qwest's argument, the trial court's ruling on "Motion for Determination of Law Re: Assumption of Duty" addressed only "a transfer of ownership rights." As to the latter, "improvement" is not defined by the WCA, and multiple facts may be considered, including "the intention of the owner of an item located on real property or the intention of the real property owner." *Barron v. Kerr–McGee Rocky Mtn. Corp.*, 181 P.3d 348, 351 (Colo. App.2008).

But because Qwest failed to identify the WCA defense in the trial management order or mention this defense during trial, Blood had no reason to present evidence on it on rebuttal. *See Popovich*, 811 P.2d at 385 (defendant bears the burden of establishing exclusivity defenses under WCA). And because Qwest also failed to tender an instruction on the WCA, the jury did not decide the issue. *See J & K Constr. Co. v. Molton*, 154 Colo. 214, 390 P.2d 68, 73–74 (1964) (holding that disputed issue with respect to WCA bar was properly submitted to jury); *Radil*, 384 F.3d at 1226; *cf. Massie v. Godfather's Pizza, Inc.*, 844 F.2d 1414, 1421 (10th Cir.1988) (same result under Utah law).

### B. Premises Liability Act

■ Alternatively, Qwest contends that even if the WCA was waived, the trial court erred in denying its post-judgment motion based on PLA section 13–21–115(5)(b). Although the motion was denied by operation of law under C.R.C.P. 59(j), we can affirm on any ground supported by the record. *See Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo.App.2004).

■ Qwest pleaded the PLA as an affirmative defense, included it in the trial management order, and raised it in a post-judgment motion to set aside the verdict. But as with the WCA, Qwest did not submit any proposed jury instruction on the PLA or otherwise raise it at trial.

Nevertheless, Qwest argues that its post-judgment motion adequately raised the issue because under section 13–21–115(4), C.R.S. 2008, the "judge shall determine whether the plaintiff is a trespasser, a licensee, or an invitee, in accordance with the definitions set forth in subsection (5) of this section," not the jury. According to Qwest, "there was nothing for the jury to decide under the PLA after evidence showing Qwest did not have knowledge of P5905's condition."

Based on the cases discussed above, we conclude that Qwest also waived this defense by defending the case at trial on negligence principles, not on the PLA. Moreover, error in denying Qwest's motion, if any, was harmless.

Even if the PLA applied and the trial court could have determined that Blood was a licensee from undisputed facts, as Qwest asserts, it would still remain liable. "[T] he circumstances under which a licensee may recover include all of the circumstances under which a trespasser could recover." § 13–21–115(3.5), C.R.S.2008. Trespassers may recover from owners who act either "willfully or deliberately." § 13–21–115(3)(a), C.R.S. 2008. Exemplary damages are proper if the defendant's conduct was "willful and wanton." § 13–21–102(1)(a). The same term, here "willful," should generally be given the same meaning, "unless the context requires different interpretation." *Stoorman v. Greenwood Trust Co.*, 908 P.2d 133, 135 (Colo.1995). We discern no contextual requirement to define "willful" differently.

Under the instructions, the jury's exemplary damages award means that it found Qwest's conduct both "willful" and "wanton." Hence, because of the "or" in section 13–21–115(3), a finding of "willful[ness]" alone satisfies the PLA, and we need not address whether Qwest's conduct was also "deliberate[ ]."

Therefore, had the court determined that the PLA applied, because Qwest's willful and wanton conduct would have made it liable to Blood under the PLA the jury would also have determined damages, just as it did on the negligence claim. § 13–21–115(4). Nor does the PLA exclude exemplary damages. *See Martin v. Union Pacific R.R. Co.*, 186 P.3d 61, 71 (Colo.App.2007) (*cert. granted* June 30, 2008).

In sum, we discern no ground for reversal as to the WCA and PLA defenses.

## VI. Conclusion

The order increasing exemplary damages is vacated and the case is remanded for an evidentiary hearing on that issue. In all other respects, the judgment and orders are affirmed.

Judge FURMAN concurs.

Judge RICHMAN concurs in part and dissents in part.

Judge RICHMAN concurring in part and dissenting in part.

I agree with the majority's comprehensive opinion to the extent it affirms the liability of Qwest, the finding of no liability on the part of Xcel, and the judgment for actual damages. I also agree that the trial court's order increasing exemplary damages should be vacated, but write separately to express specific concerns about the application of Colorado's exemplary damages statute. I write separately in dissent because I believe the jury's award of exemplary damages also must be vacated.

### I. The Jury's Award of Exemplary Damages

I concur with the majority's conclusion and reasoning that Colorado's exemplary damages statute, section 13–21–102(1)(b), C.R.S. 2008, which permits a jury to award exemplary damages for conduct "which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others," is not unconstitutional, either on its face or as applied in this case, under *Philip Morris USA v. Williams*, 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007).

As the majority correctly concludes, conduct that jeopardizes the rights and safety of others may be punished because it is reprehensible as explained in *Philip Morris*, provided that the award of exemplary damages is not based on evidence of actual harm to persons other than the plaintiff, or argument that the jury should punish the defendant for actual harm to persons other than the plaintiff. On remand, the Oregon Supreme Court summarized the holding of the Supreme Court in *Philip Morris* as follows:

[H]arm to nonparties (to the extent that it exists) may play a role in the punitive damages calculus in the sense that it is relevant to showing the degree of repre-

hensibility of a defendant's conduct. The Court distinguished, however, between legitimate use of evidence of such harm to establish reprehensibility and illegitimate use of that evidence to punish defendant for harm it caused to nonparties.

*Williams v. Philip Morris Inc.,* 344 Or. 45, 176 P.3d 1255, 1259 (2008) (citation omitted).

In the instant case, because no evidence or argument of actual harm to others was presented to the jury, there is no reason to believe the statute was applied in an unconstitutional manner by permitting the jury to award damages for actual harm to others.

I also read the majority opinion as recognizing that to the extent a jury is permitted to consider potential harm to others, such harm may be considered only in the calculus of measuring reprehensibility. The majority's citation to *Action Marine, Inc. v. Continental Carbon Inc.,* 481 F.3d 1302, 1320 (11th Cir.2007), supports this understanding, as the language quoted limits the consideration of "the risk of harm to others" to be "part of the reprehensibility analysis." I agree with this limitation.

The majority also suggests, without explicitly holding, that the constitutional due process mandate of *Philip Morris* is satisfied if the jury is given an instruction that it may consider the harm to others in determining reprehensibility (i.e., the reasonable relationship between the defendant's punishable misconduct and the harm caused to the plaintiff), but it may not punish the defendant for the impact of its alleged misconduct on other persons. Such an instruction will prevent the jury from misunderstanding the distinct applications as it weighs evidence of "harm to others." The same suggestion was made, if not mandated, by the Supreme Court in *Philip Morris,* when it stated:

> [W]e believe that where the risk of that misunderstanding is a significant one—because, for instance, of the sort of evidence that was introduced at trial or the kinds of argument the plaintiff made to the jury—a court, upon request, must protect against that risk. Although the States have some flexibility to determine what kind of procedures they will implement, federal constitutional law *obligates* them to provide

some form of protection in appropriate cases.

549 U.S. at 357, 127 S.Ct. 1057 (emphasis added).

No such instruction was given here, yet the record is clear that Qwest did not request such an instruction. In my view, in order to ensure that the Colorado exemplary damages law is applied consistently with the due process requirements set forth in *Philip Morris,* this court should explicitly hold that such an instruction shall be given, upon request, in any case where evidence of actual or potential harm to others is admitted for the jury's consideration in weighing the reprehensibility of a defendant's conduct.

Notwithstanding the constitutionality of Colorado's exemplary damages statute on its face and as applied here, and the failure of Qwest to request an instruction as discussed above, I believe the jury's award of exemplary damages must be vacated. Therefore, for the reasons set forth below, I dissent from the majority opinion to the extent it affirms the jury's award of exemplary damages.

An award for exemplary damages that is "grossly excessive" violates constitutional limits. *Philip Morris USA v. Williams,* 549 U.S. at 353, 127 S.Ct. 1057. I believe the exemplary damages assessed by the jury here were "grossly excessive" because: (1) the compensatory damages included a punitive component, (2) Qwest's behavior was not sufficiently reprehensible to warrant the amount of exemplary damages awarded by the jury, and (3) evidence of post-accident conduct tainted the jury's award.

Although the United States Supreme Court's guidelines on when exemplary damages are constitutionally excessive could be clearer, we are able to discern certain principles, such as the effect of duplicative compensatory awards and the requirement of reprehensibility.

### A. The Compensatory Damages

Compensatory damages for an injury may well be based on components that are duplicated in the exemplary damages award, particularly where the compensatory damages include amounts for emotional distress or

humiliation. *State Farm Mut. Auto. Ins. Co.,* 538 U.S. 408, 426, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *see* Restatement (Second) of Torts § 908 cmt. c, at 466 (1977) ("[i]n many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both").

As pertinent here, the jury awarded $9,917,600 in economic losses, $1,000,000 in noneconomic losses, $10,000,000 for physical impairment and disfigurement, and $18,000,000 in exemplary damages.

In closing, Blood's attorney presented his argument for economic losses. He stated that the total present value of Blood's loss of earning capacity, as presented by expert testimony, was $3,205,500. He reiterated the significant expenses required for Blood's physical care, and estimated the total economic loss for medical expenses at over $8 million. The jury awarded just under $10 million in economic losses.

Blood's attorney next argued losses for physical impairment and disfigurement. He couched the cost of physical impairment in terms of functional and physical capability, including loss of cognitive function from pain. He argued:

> How do we value what was taken away? ... Take away what somebody loves to do, you find the job you love, you're very fortunate in life. Take it away and you've taken away more than money. Money is the easy thing, that's the fixed part. But to make up for it, that's the impairment part.
>
> How do you compensate? How bad, how long, how much does it interfere?

Blood's attorney asked for between $10 and $15 million for physical impairment. He asked for a separate award for pain and suffering, but reminded the jury that any award for pain and suffering should not overlap anything included in physical impairment.

Based on the way physical impairment was argued, I would conclude at least some pain and suffering was included in the physical impairment award, and thus could be duplicative of the exemplary damages award.

The punitive aspect of the impairment award is demonstrated by the way Blood's attorney argued physical impairment:

> Is it that if you give this large amount of money, somehow, the scales will be out of balance? Somehow, Andy Blood and Carrie will have gotten something they didn't deserve, they would have gotten a better bargain, they would have gotten a windfall?
>
> What Qwest is really telling you is the price is too high, the cost is too great to ask us to pay that. There is a price for everything in life.
>
> . . . .
>
> There is a price to be paid for not doing the inspection, maintenance, and repair program. And Andy Blood and Carrie Blood have paid that price. They pay today. They will pay it every week, every month, and every year for the next 50 years.
>
> It is time for Qwest to pay the price, to bear the cost of the consequences of what they have done.
>
> . . . .
>
> Qwest must be held 100 percent responsible because the only way Qwest will be responsible is if you make them fully responsible.

This argument essentially asks the jury to punish Qwest. Because the jury also awarded exemplary damages separately, I conclude the award is partially duplicative.

### B. Reprehensibility

"Perhaps the most important indicium of the reasonableness of [an exemplary] damages award is the degree of reprehensibility of the defendant's conduct." *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *see Exxon Shipping Co. v. Baker,* —— U.S. ——, ——, 128 S.Ct. 2605, 2621, 171 L.Ed.2d 570 (2008)(exemplary damages apply to cases where defendant's conduct can be characterized as "outrageous," "enormous," "gross

negligence," "willful, wanton, and reckless indifference for [the rights of others]," or behavior "even more deplorable").

Evidence of several factors tended to negate a conclusion that Qwest's conduct was reprehensible. Qwest employees testified that Qwest relied on pre-climb procedures (visual inspection, sounding, and prodding) by professional linemen to detect faulty poles, and that Blood did not fully follow these pre-climb procedures. This was the first serious utility pole injury in the forty-four-year term of the JUC, and so Qwest was not on notice of the inadequacy of its inspection program. Qwest was not legally required to inspect the poles, although it was contractually required to do so. There was no state penalty for noninspection.

In light of these facts, Qwest's actions appear more negligent than willful and wanton, which casts doubt on the constitutionality of the jury's exemplary damages award.

### C. Post–Accident Conduct

I also conclude that under the circumstances of this case, the jury's award of exemplary damages likely included punishment for Qwest's post-accident conduct, contrary to Colorado law and the court's jury instructions. As stated in *Bennett v. Greeley Gas Co.*, 969 P.2d 754 (Colo.App.1998):

> Our current statute, [section] 13–21–102, provides for the jury to assess punitive damages, but gives the trial court authority to increase the award. This creates the potential for evidentiary difficulties.
>
> The function of the jury is distinct from that of the court. The purpose of the jury's award of punitive damages is to punish the wrongdoer for willful and wanton conduct. However, the conduct referred to is that causing the injuries. It is the quality of that tortious act, not the character of the wrongdoer, that justifies exemplary damages. As a result, acts of the wrongdoer occurring after the event creating liability ordinarily are not material to the jury's award of exemplary damages.

969 P.2d at 761 (citations omitted); *see also Jones v. Cruzan*, 33 P.3d 1262, 1264 (Colo.

App.2001) (ordinarily, the acts of a wrongdoer occurring after the event creating liability are not material to the jury's assessment of punitive damages).

Because the trial court in this case admitted evidence of post-accident conduct, and because counsel argued such conduct to the jury in support of the exemplary damages award, Qwest moved for a mistrial. Rather than declare a mistrial, the court instructed the jury it could consider only Qwest's conduct prior to the date of the accident in relation to exemplary damages. Nonetheless, I believe the jury's award of exemplary damages impermissibly took into account such post-accident conduct.

Evidence that Qwest had never instituted a pole inspection program necessarily affected both the jury's original exemplary damages award and the trial court's increase of the award. I assume without deciding that admitting the evidence was proper both because Qwest opened the door, and because the evidence showed Qwest's intent. *See Antolovich v. Brown Group Retail, Inc.*, 183 P.3d 582, 598 (Colo.App.2007) (improperly admitted evidence that is cumulative to admissible evidence is harmless). However, I note that the "opening the door" argument goes only so far. In this case it may permit Xcel to level the playing field by bringing in the full story, but it does not necessarily entitle the Bloods to argue the post-accident conduct in support of exemplary damages, as discussed below. *See Itin v. Ungar*, 17 P.3d 129, 132 n. 4 (Colo.2000) ("The concept of 'opening the door' represents an effort by courts to prevent one party from creating a misleading impression through the selective presentation of facts by allowing the other party to explain or contradict that impression through evidence that might otherwise be inadmissible.").

In any event, I disagree with the majority's conclusion that the post-accident evidence had no effect on the jury's exemplary damage award. It is true we presume that a jury follows the trial court's instructions. *See People v. Harlan*, 8 P.3d 448, 473 (Colo. 2000). However, in some cases the evidence is so prejudicial that a curative instruction is insufficient. *See People v. Goldsberry*, 181

Colo. 406, 410, 509 P.2d 801, 803 (1973); *People v. Anderson,* 183 P.3d 649, 652 (Colo. App.2007); *but see Roget v. Grand Pontiac, Inc.,* 5 P.3d 341, 347 (Colo.App.1999) (objectionable characterization of evidence during closing arguments does not necessarily constitute reversible error where jury is given curative instruction, and single reference was not material to any prevailing claims).

As the majority recognizes, the parties wrestled throughout the trial over the in limine order prohibiting reference to post-accident conduct. This wrestling began with the opening statement and continued during examination of witnesses. Some questions referenced the prohibited post-accident period, while others were temporally limited or ambiguous. Approximately six objections were sustained.

Ultimately, Qwest opened the door to evidence about post-accident conduct, and the trial court permitted a single question of witness Schmidt, as follows:

And Qwest has done that [charge Public Services the full amount of the rent on its poles] even though since June 29, 2004 Qwest has continued to engage in the practice of not inspecting, maintaining, and repairing its utility poles on a routine basis; isn't that true?

However, in questioning the next witness, an Xcel employee, Blood's attorney again asked:

Now, are you—were you aware before today that even now, three years after pole 5905 failed and caused injuries to Andrew Blood, Qwest still does not engage in any routine inspection, maintenance, and repair program of any of its poles in Colorado; were you aware of that?

The employee replied:

I'm not aware that Qwest is doing anything, no, with ground line inspection of poles.

During closing, Blood's attorney argued:

Qwest as you heard yesterday, continues, even after this happened, continues to refuse to maintain, inspect, repair, replace its utility poles in Colorado.

He then repeated his question of the day before:

And Qwest has done that [continued to charge the full amount of rent] even though since June 29, 2004 Qwest has continued to engage in the practice of not inspecting, maintaining, and repairing its utility poles on a routine basis. . . .

Later, Blood's attorney went on:

They admit, we don't inspect and maintain any of the 157,862 poles we have, and they still don't do it, even today.

. . . .

This—mostly ironically, this argument about not liking what Public Service is doing comes from a company that even today, three years after Andy Blood is injured, still is not out there inspecting, maintaining, repairing on a regular basis a single pole.

When Blood's attorney began to talk about exemplary damages, he argued:

Nothing tells you more about the purposely-committed conduct than what has happened at Qwest since June 29th, 2004. Knowing what has happened, hearing all of these witnesses, their own witnesses, Qwest still, today, does not have a program for inspecting, maintaining, and repairing its telephone poles. Qwest is not listening, Qwest has not heard the break of the telephone pole when Andy was on it. Qwest has not heard the impact of Andy Blood and that telephone pole hitting the ground.

. . . .

You and only you have the power to make Qwest listen.

Your verdict sends a message—all verdicts send a message. Your verdict sends a message that says you must pay for what you did *and because you continue to do it.*

. . . .

[I]f sometime in the near future we were to see Mark Schmidt and we were to say to him, Mark, do you have an inspection and maintenance and repair program? Mark would look at us and say, Yep, I've

got the budget and I've got the instruction. That's the message your verdict can send.

(Emphasis added.)

After Blood's attorney repeatedly emphasized the post-accident conduct, the trial court, although acknowledging that such argument was not appropriate to be considered for punitive damages, denied Qwest's motion for a mistrial. Instead the court orally instructed the jury, after it had been provided with copies of the written instructions, that only conduct prior to the date of the accident could be considered for exemplary damages.

However, because the entire argument for exemplary damages centered on the post-accident conduct, and because the post-accident conduct was a theme throughout the trial, both before and after the door was opened, I conclude the exemplary damages award necessarily reflected post-accident conduct.

The trial court's own order increasing the damages supports this conclusion. Blood's post-trial motion for increased exemplary damages stressed Qwest's continuing post-accident behavior, and the trial court increased the damages for the continuing failure to inspect, maintain, and repair its poles during the pendency of the case pursuant to section 13–21–102(3)(a), C.R.S.2008. Because the trial court did not hold a hearing, the only evidence before it was the same evidence presented to the jury. If that evidence was sufficient for the trial court to increase the damages, it is difficult to conceive that the jury could have ignored it completely, especially when it was the entire basis for exemplary damages as argued by Blood's attorney.

Accordingly, I believe the jury, in part, punished Qwest's post-accident conduct by awarding $18 million in exemplary damages, and such award is contrary to the law in Colorado and the jury instructions.

## II. The Court's Increase of Exemplary Damages

I also concur with the majority's conclusion that Colorado's exemplary damages statute, section 13–21–102(3)(a), is not unconstitutional on its face under *Philip Morris USA*. The statute permits the trial court to increase the jury's award of exemplary damages to a sum not to exceed three times the amount of actual damages, when the defendant has continued the behavior which is the subject of the claim against the defendant in a willful and wanton manner, either against the plaintiff or another person or persons, during the pendency of the case.

Of course, the *Philip Morris* opinion does not address a statutory scheme such as Colorado's which permits a court to increase a jury's exemplary damages award. I believe the majority, while not so stating explicitly, acknowledges that the constitutional limitations of *Philip Morris* apply equally to a court-awarded increase in exemplary damages.

I reach the conclusion that Colorado's statute does not run afoul of *Philip Morris* because the conduct which permits the court to increase the exemplary damages, referred to generically as "post-accident conduct" although more correctly labeled as "post-filing conduct," may be found to be reprehensible, within the *Philip Morris* definition of that term, when it occurs under circumstances that indicate a willful and wanton disregard by the defendant of a hazard that has now been made known to it. However, for the statute to be constitutional under *Philip Morris*, I believe we must interpret this statute to allow the court's consideration of actual or potential harm to others only as a reprehensibility factor in connection with the increased award.

As indicated above, I also construe a proper application of the holding in *Philip Morris* to require that where the reprehensible conduct which supports the jury's award of exemplary damages is actual or potential harm to others, that conduct cannot also be the reprehensible conduct that provides the basis for an increase in exemplary damages by the court. Rather, separate reprehensible conduct must be found by the court to support the increase.

The Colorado exemplary damages statute, when properly applied, satisfies this requirement of *Philip Morris*. The jury's award of exemplary damages must be based solely on reprehensible conduct that occurs before the

accident; the court's increase of an exemplary award may be based only on reprehensible conduct that follows the filing of the case.

I believe Colorado law mandates such a separation of the exemplary damages award. Under the rationale of *Bennett v. Greeley Gas Co.*, it must be clear that a jury's award of exemplary damages is based only on pre-accident willful and wanton conduct, and a court's increase is based solely on post-filing conduct. A trial court may rely only on behavior during the pendency of the case when ordering treble damages. *Eurpac Service Inc. v. Republic Acceptance Corp.*, 37 P.3d 447, 453 (Colo.App.2000) (citing *Bennett*). Since the statute has been so interpreted, I agree with the majority that the statute is not facially unconstitutional.

Based on these constitutional and statutory limitations on the court's authority to increase an exemplary damages award, I agree with the majority that such an award cannot be affirmed on de novo review in the absence of meaningful findings. We cannot determine if the statute was constitutionally applied in this case. The court's order of September 4, 2007, increasing the award of exemplary damages from the $18 million awarded by the jury to "three times the actual damages awarded by the jury," or approximately $62 million, contains only the barest explanation of the reasons for the increase. The order primarily paraphrases the statute and states that Qwest's failure to inspect, maintain, and repair its poles during the pendency of the litigation posed a substantial risk of harm to the plaintiffs, or another person or persons.

The trial court did not find that Qwest's continuing conduct was willful and wanton, or that it was different from the pre-filing conduct on which the jury presumably awarded exemplary damages. Nor did the court indicate whether the increased award was based on actual or potential harm to others, or whether such harm to others, arising from post-filing conduct, was considered as a matter of reprehensibility only, and not to punish.

Because the order does not indicate that the conduct was willful and wanton, give any reasons why the court would find the conduct to be so, consider or address any evidence submitted by Qwest in explanation of why it did not inspect, maintain, or repair the poles during the pendency of the litigation, or otherwise provide meaningful findings to justify increasing the jury's award, I agree with the majority that the court's order increasing the exemplary damages in this case must be vacated and the matter remanded to the court for a hearing and findings.